## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| TRENT MURCH, | ) | |
| | ) | Case No. 20-cv-3900 |
| Plaintiff, | ) | |
| | ) | Judge Sharon Johnson Coleman |
| v. | ) | |
| | ) | |
| SUN LIFE ASSURANCE COMPANY OF CANADA, | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION AND ORDER

Plaintiff Trent Murch filed this suit against defendant Sun Life Assurance Company of Canada ("Sun Life"), seeking review of Sun Life's decision to deny his application for long-term disability insurance benefits pursuant to the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1132 ("ERISA"). Before the Court are the parties' cross-motions for summary judgment [87] [95]. For the following reasons, the Court grants and denies plaintiff's motion in part and denies defendant's motion in its entirety.

**Facts**

The Court has summarized pertinent points from the parties' respective Rule 56 statements. In their responses to the opposing parties' Rule 56 statements, the parties dispute how to characterize certain facts and the Court finds that this characterization is often argumentative, not factual. Thus, the Court will focus directly on factual quotes from the administrative record ("AR"). Furthermore, both parties critique the other party's failure to abide by the paragraph limitations set forth in N.D. Illinois Local Rule 56.1. The Court has decided not to sanction either party. *See Stevo v. Frasor*, 662 F.3d 880, 887 (7th Cir. 2011) ("[T]he decision whether to apply [Rule 56.1] strictly or to overlook any transgression is one left to the district court's discretion.") (quoting *Little v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir. 1995)).

Before he stopped working, Murch was a transactional attorney.[1]  He began practicing law in 1998 and later became a shareholder at Greenberg Traurig, LLP, where he practiced until November 7, 2018.  At that time, Murch stopped working, citing his claimed disabilities.  As Murch later explained, he "sometimes [] would be at work sitting in front of the computer and the fatigue would be so bad that eventually he would feel like he had the inability to move."  AR 2354.  After consulting with several doctors, Murch applied for disability leave.

## I.      Sun Life's Disability Policy

While at Greenberg Traurig, LLP, Murch participated in the firm's employee welfare benefit plan.  On January 10, 2019, Murch submitted his claim for long-term disability benefits to Sun Life pursuant to the terms of its Group Long Term Disability Policy (the "Policy").  The Policy permits payment of a monthly benefit when an employee provides notice and Proof of Claim (which requires evidence demonstrating the disability).  The Policy defines total disability as when the employee, "because of Injury or Sickness, is unable to perform one or more of the Material and Substantial Duties of his Own Occupation."  AR 46.  "Own Occupation" is defined as:

> the usual and customary employment, business, trade, profession or vocation that the Employee performed as it is generally recognized in the national economy immediately prior to the first date Total or Partial Disability began.  Own Occupation is not limited to the job or position the Employee performed for the Employer or performed at any specific location.

AR 45.  Material and substantial duties constitute "essential tasks, functions, skills or responsibilities required by employers for the performance of the Employee's Own Occupation."  AR 44.

## II.     Murch's Benefits Application

In Murch's original claim packet, he attested to the following symptoms:

> Extreme Tiredness; Shaking of hands, made severe with medications; Inability to speak words frequently when under stress levels that are typical during work conversations; Pain, numbness, and weakness in arms, hands, legs, and feet; Memory, concentration, confusion, and other speech problems (saying wrong

---

[1] It is important to emphasize that Murch has no experience as a medical professional.

> word or nonsense word); Falls; Fatigue; Bladder incontinence. Many of the
> proceeding may be worsened due to medication side effects. Also nausea;
> Occasional hallucinations in peripheral vision; Auditory or visual hallucinations
> when waking or falling asleep, often violent; Fall asleep with little or no notice or
> knowledge that I am about to fall asleep. Some medications cause periods when I
> talk very fast (and I don't realize it) and also shake badly, making it obvious I am
> taking some type of drugs and am not in condition to work a job or someone
> people want to be around.

AR 13. Along with this submission, Murch provided an Attending Physician's Statement by Dr.

Megan Bailey, his neurologist, who listed "REM Sleep Behavior Disorder" as Murch's primary

diagnosis, with a secondary diagnosis of "functional neurological symptom disorder w/ mixed

symptoms." AR 105. She noted that his MRI, NCV/EMG, and neurological exam came back

normal, but that he had an action and postural tremor. *Id.* On this form, Dr. Bailey noted that

Murch had "no limitation of functional capacity." AR 107.

III.    *Sun Life's Initial File Review and Decision*

In response to Murch's submission, Sun Life set up a home visit where an interviewer spoke

with Murch. AR 388. The interviewer noted that Murch moved "in a fluid and unrestricted

manner" but that Murch "appeared tired during the interview." AR 389. Murch told the

interviewer about his REM sleep disorder (which Murch opined could be a precursor to

Parkinson's), as well as about his hallucinations. Murch lamented that his symptoms were "all-

consuming." AR 395. He took Adderall, but still felt fatigued. The interviewer listed his symptoms

at the time of the interview as nausea, pain, numbness, vocal tick, and bladder incontinence. AR

395. Murch also informed his interviewer that his doctors had told him he should not work and not

to drive. AR 400. Nonetheless, Murch admitted that he still drove when he "need[e]d" to and had

even fallen asleep at the wheel. AR 405.

Following this home visit, Sun Life requested that Murch send medical and evaluation

records from seven of Murch's treatment providers: Dr. Matthew Plofsky (family doctor), Dr.

Thomas Rebori (who appears to be a psychiatrist), Dr. Steven Tovian (psychologist), Dr. Alfonso

Bello (fibromyalgia specialist), Dr. Bailey, Dr. Jesse Taber (neurologist), Dr. Claire Kenneally (sleep specialist), and Dr. Jerry Sweet (neuropsychologist).

According to these records, Murch saw Dr. Plofsky on September 19, 2018. Regarding Murch's neurological symptoms, Dr. Plofsky reported "[m]ental status normal. Gait normal. Reflexes normal and symmetric. Cranial nerves 2-12 intact. Muscle strength 5/5 throughout. Has halting speech at times, ?tic. Mild upper body tremor." AR 641. Murch also submitted records from Dr. Rebori from October 2018. Murch expressed to Dr. Rebori that "[b]eing available at the hours and for the durations my clients need, and being able to function at the intellectual level necessary, are things I can't do anymore." AR 1558. As a result of his fatigue, Dr. Rebori increased Murch's prescription of Modafil, a stimulant, which he prescribed along with Adderall. Regarding Murch's request for medical leave, Dr. Rebori stated: "If you and Dr. Tovian have talked through this and he is supportive of you taking a medical leave, then I of course will support this." AR 422.

Dr. Tovian indeed supported Murch's leave. Dr. Tovian had provided individual psychotherapy to Murch. AR 434. He noted that Murch faced "[s]evere cognitive impairment involving concentration, attention, short-term retrieval, and executive functioning." AR 434.

Murch also provided two office reports from Dr. Bello from October 3, 2018 and December 18, 2018. The October 2018 report mentioned that Mayo Clinic had diagnosed Murch with fibromyalgia, that Murch had "diffuse muscle tenderness without weakness," and that his "PAIN [w]as rated at 9/10." AR 460. Dr. Bello also noted Murch's "full range of motion" for his upper and lower extremities and laboratory examinations within normal limits. *Id.* The December 2018 report had similar results. AR 443. Dr. Bello explained that Murch "[c]ontinue[d] to do well from a musculoskeletal pain standpoint on the combination of Lyrica and Cymbalta." AR 440.

Murch also submitted several reports from neurologists and sleep medicine experts. During an August 16, 2018 visit, Dr. Bailey noted that Murch's work was "suffering due to fatigue." AR

508. She summarized his evaluation from the Mayo Clinic, where "[d]uring a sleep evaluation it was found that [Murch] had 5 ½ hours of sleep on average, significant [REM Behavior Disorder] and [Periodic Limb Movements] on sleep study." AR 509. Dr. Kenneally saw Murch on September 27, 2018 and noted his "massive sleepiness during the day." AR 549. Dr. Kenneally assessed his condition as psychophysiologic insomnia and explained "[h]is biggest issue at this point seems to be his inability to function during the [sic] daytime, but not clear this is related to his sleep issues." AR 550. She conducted an Epworth Sleepiness Scale test, where Murch scored a 20/24, suggesting significant sleepiness. AR 551. Nonetheless, Dr. Kenneally found his sleep issues to be well controlled. Murch also submitted a report from Dr. Taber, who he saw on December 4, 2018. Dr. Tabor concluded that "[t]here was no evidence [Murch] suffered from any serious underlying neurologic disorder" but that "some of his symptoms reflect underlying medical conditions (REM behavior disorder, mild sleep apnea, periodic limb movement disorder, insomnia, fibromyalgia), some also reflect medicines . . . and of course severe anxiety and depression." AR 631–32.

On January 17, 2019, Murch saw Dr. Sweet and underwent various tests for which both Murch and Sun Life point to normal and abnormal results. Dr. Sweet concluded that there is "no substantial evidence of meaningful cognitive deficits at this time. The difficulties Mr. Murch described and is currently experiencing are due to other factors, such as psychological conditions and prescription medications." AR 483 (emphasis in original). Dr. Sweet recognized that "[a]nxiety, depression, stress, lack of refreshing sleep, and side effects from prescription medication may interfere with cognitive effectiveness … [and] can compromise other aspects of cognition, such as remembering conversations, word retrieval, attending to multiple tasks at once, and organizing thoughts and speech." AR 483. Dr. Sweet noted that "Murch evidenced possible over-reporting" of his symptoms but also that "individuals experiencing significant psychological/emotional distress, in addition to having multiple medical conditions, may have elevated scores on the[] validity scales"

5

used to assess symptom validity. AR 480, 482. Dr. Sweet concluded that "[p]resent findings do not indicate a neurocognitive disorder, but rather a Somatic Symptom Disorder . . . which is a complex psychological disorder characterized by excessive worry about somatic symptoms that assume a central role in an individual's life." AR 483.

Sun Life undertook a separate investigation. Sun Life had Murch surveilled in February and early-March, 2019. During this time, investigators witnessed Murch engaging in activities such as driving, assisting his children, and shopping.

Sun Life also retained two doctors to review Murch's medical file. Dr. Margaret O'Connor concluded, referencing Dr. Sweet's report, that Murch faced no cognitive limitations and his "cognitive functions were intact." AR 678. Upon learning that Murch drove, she concluded that "[t]his suggests that [Murch] has sufficient attention and concentration to s[]upport this very complex activity." *Id.* In an addendum report, Dr. O'Connor noted that the "medical record do[es] not provide adequate support that a behavioral health condition is rising to a level in which it is impairing" for Murch. AR 704. She noted "there is no comprehensive assessment of his psychiatric status in the file" and that Dr. Sweet referenced a potential for "over-reporting." AR 705.

Regarding Murch's physical limitations, neurologist Dr. Seth Stoller concluded that there was "no major evidence of physical functional impairment," and that despite his tremor, Murch could "lift objects, run, and drive." AR 688. Dr. Stoller concluded that there "[wa]s no contradindication to [Murch] performing sedentary work." AR 689. Dr. Stoller also wrote that he spoke with Dr. Bailey, who told him that she thought Murch should avoid driving while tired but did not provide other examples of limitations, although she deferred further comment to a sleep specialist. AR 685.

On April 19, 2019, Sun Life denied Murch's disability claim, finding the information provided did not show he was unable to perform the material and substantial duties of his Own Occupation. Sun Life determined that Murch's Own Occupation was "Lawyer, Business Law," a

sedentary occupation that required several mental demands, including dealing with people,

performing a variety of duties, influencing people in their opinions, and directing, controlling or

planning activities of others.  This definition differed from Murch's own description of his practice:

> [d]rafting and reviewing complex transaction documents, securities disclosure
> documents (such as registration statements and prospectuses), and legal opinions;
> Researching and analyzing legal issues; Drafting and reviewing correspondence
> pertaining to legal matters; Phone calls discussing and negotiating legal issues;
> Managing deal teams, including identifying and assigning legal tasks, reviewing and
> analyzing work product, drafting comments and revisions to same, and negotiating
> [] with opposing counsels.

AR 150.  Upon reviewing the evidence, Sun Life concluded that Murch's "subjective symptoms are

not consistent with the neurology and neuropsychological testing" and that the results "do not

support impairment related to any physician or behavioral health condition(s)."  AR 726.

IV.     *Murch's Appeal and Sun Life's Further Review*

Around four months later, Murch appealed Sun Life's denial of benefits.  Along with a letter in

support of his appeal, Murch's file included:

- Dr. Bello's narrative report, confirming Murch's fibromyalgia diagnosis and noting other
  conditions, such as a sensitization disorder and obstructive sleep apnea. AR 886-87.  Dr.
  Bello found Murch was not able to "perform sedentary occupation and higher-level
  cognition function due to fibromyalgia and its medical management."  AR 887.
- Dr. Kenneally's note explaining that Murch's symptoms "clearly limit[ed] his ability to
  work" but that his sleep disorders were well controlled by clonazepam.  AR 788–89.
- The Social Security Administration's ("SSA") decision denying Murch's request for benefits
  but finding he was limited to "light; unskilled work."  AR 794.
- Excerpted records from the Mayo Clinic recognizing "symptomatology from . . . sleep
  dysfunction, anxiety, fibromyalgia, pain and chronic fatigue syndromes."  AR 855.

In response, Sun Life continued its investigation.  Sun Life requested an independent

medical evaluation of Murch.  Although Sun Life requested an evaluation by a physician specializing

in occupational medicine, Murch objected to the visit due to distance and requested to have a closer

appointment with a rheumatologist or a neurologist.  Sun Life complied, and set up an appointment

with Dr. Rhutav Parikh, a rheumatologist whose review would be limited to assessing Murch's

fibromyalgia. After examining Murch on October 4, 2019, Dr. Parikh concluded that Murch's fibromyalgia was well managed and controlled, with minimal trigger points. AR 2877. Thus, he found that Murch's "subjective complaints of pain and dysfunction related to fibromyalgia are out of proportion with his objective findings on examination" and "[i]n regards to diagnosis of fibromyalgia, there is no significant clinical functional impairment," no cognitive impairment, or "any restrictions for work." AR 2877-78. Murch's other conditions, like sleep disorder and somatic symptom disorder, were "out of the scope of [his] practice" and Dr. Parikh would not comment upon them. AR 2878. During the day of the evaluation and the following day, Murch was again under surveillance. They saw Murch lay down on a bench after the examination before he took a ride share home. AR 1197.

On October 7, 2019, Murch provided Sun Life with additional documents, including a plan of care from Dr. Bailey, his entire social security disability claim file, and additional Mayo Clinic records. He provided a record from February, 2019, where Dr. Bailey had certified that Murch was unable to bathe or dress himself without substantial assistance from another individual. AR 1194. Murch's Mayo Clinic records contained the following conclusions:

- Dr. Maja Tippmann-Peikert, a neurologist / sleep medicine specialist, ruled out narcolepsy but noted a rebound phenomenon in light of Murch's known chronic insomnia disorder. AR 1360.
- Dr. Maria Poiner, a fibromyalgia and chronic fatigue physician, noted 12/18 tender points. AR 1362.[2] She also found that Murch had "central sensitization disorder," "a central nervous system response to heightened stress that amplifies sensation markedly." AR 1362.

Murch's social security claims included the SSA's disability determination explanation. The doctors who completed this explanation reasoned that "the claimant's medically determinable impairment could reasonably be expected to cause the alleged symptoms [but] the statements

---

[2] Tender points tests appear to be similar to trigger point tests, and the Court understands that both are used to assess fibromyalgia pain.

concerning the intensity, persistence, and limiting effects of these symptoms are found to be exaggerated when compared to the totality of the evidence in the file." AR 1941. According to these doctors, "[p]resent findings do not indicate a neurocognitive disorder but rather a Somatic Symptom disorder." AR 1939. The doctors noted the following impairments: severe neurogenerative disorder of the central nervous system, inflammatory arthritis, spine disorders, somatic symptom and related disorders, and anxiety and depressive disorders. AR 1937. They also noted that Murch was "moderately limited" in his ability to complete a normal workday. AR 1944. The SSA file also reported findings from an independent medical evaluation conducted by Dr. Olga Lansky, who Murch claims noted 14/18 tender points during the examination. AR 1921–22.

At this stage in the appeal, Sun Life solicited additional medical reviews, which Sun Life provided to Murch for comment and review:

- Dr. Leonard Cosmo, a sleep medicine specialist, concluded that the "clinical data does not provide any objective documentation to support sleep conditions" as "[n]o actual polysomnographic studies are provided." AR 1073. He found that there were no "objective impairments to support any type of neurocognitive or neuromuscular disorder." *Id.* He was instructed not to comment on Murch's cognitive conditions. AR 1054. His addendum report came to similar conclusions, but he noted he agreed with Dr. Tovian that "somatization disorder [is] the apparent psychological main condition." AR 2129.

- Dr. Michael Raymond, a neuropsychologist, concluded that "there is no objective evidence, whatsoever, to support an impairing condition" nor "evidence, from a neuropsychological perspective, to support functional limitations/restrictions." AR 1135-36. He agreed with Dr. Sweet's conclusion that the assessment "suggest[ed] some overreporting of somatic symptoms, and [] a diagnosis of somatic symptom disorder appears reasonable." AR 1136. As for Murch's psychiatric condition, Dr. Raymond noted a "[d]earth of psychiatric information which would result in psychiatric restrictions or limitations," in part because Dr. Tovian did not "provide any objective evidence to support his opinion." AR 1137. His addendum report had similar findings, but in this report he also questioned files provided by Dr. Tovian and Dr. Bailey, particularly in light of the surveillance reports, and remarked that "subjective comments regarding neuropsychological and neurocognitive alterations must be viewed cautiously." AR 2121.

- Dr. Decontee Jimmeh, a neurologist, determined that "[t]he record does not reflect any neurological condition that is functionally impairing" and that surveillance showed Murch performing "normal activities without difficulty." AR 2115. She concluded that Murch had "no limitation in functional capacity" and his "[s]elf-report of debility is in conflict with the surveillance video showing him performing normal activities without restriction." *Id.*

- Dr. Parikh, in an addendum report, maintained that Murch's fibromyalgia was well controlled, but noted "I believe his primary issues of dysfunction are more related to his sleep disorder and related to chronic fatigue and underlying psychiatric disorders as well." AR 2890-91.

In response, Murch provided an updated narrative report from Dr. Tovian, who refuted any evidence of malingering or exaggeration in Murch's claims and explained that the absence of identified neuropsychological dysfunction through tests can be common among individuals suffering from fibromyalgia. AR 2147-49. Murch also gave Sun Life additional documentation from his examinations at the Mayo Clinic. These documents contained the following findings:

- An Epsworth Sleepiness Score of 21/24. AR 2304.
- A Test of Memory Malingering ("TOMM") score of 40/50, which indicates that Murch is prone to exaggerate symptoms. However, the doctor explained "I think this is because [Murch] is quite apprehensive [] given his situation." AR 2361.
- A January 2020 report form the Chicago Sleep Center which had "findings consistent with severe [obstructive sleep apnea]" and recommending a CPAP. AR 2385.

With these new files in hand, Sun Life again sought additional addendum reports from its consulting physicians. These reports reiterated the prior findings that there was no objective evidence of deficits nor etiology for Murch's symptoms. Dr. Cosmo remarked on the lack of objective testing, like a titration sleep study. AR 2464.

Sun Life also sought file reviews from two additional providers: Dr. Robert Scalise, who conducted an occupational medicine review, and Dr. Peter Sugarman, who conducted a psychiatric review. Dr. Scalise found that "[t]he medical findings do not support functional impairments resulting from pain, fatigue or cognitive impairment that would preclude function in an occupational capacity, 8 hours a day, 40 hours per week." AR 2510. His opinion did not change upon being provided with additional records. AR 2570. Dr. Sugarman determined that "impairment due to a psychiatric condition is not supported for the timeframe of 11/8/2018 to the present, as the records do not document the presence of a severe psychiatric condition that precludes global functioning." AR 2527-29. Dr. Sugarman was not provided Dr. Sweet's report when conducting his analysis.

10

On May 1, 2020, Murch again responded to Sun Life's reports. His attorneys wrote:

> As I am sure you will acknowledge, Mr. Murch's case is exceedingly complex. As your consultants have reported, Mr. Murch is not suffering from a disabling psychiatric or cognitive impairment. Although he has received various physical diagnoses, it seems clear from the records and reports we have provided to Sun Life that Mr. Murch's doctors are biding their time and testing a variety of hypotheses until a clearer diagnosis emerges.

AR 2592. Murch provided an updated report from Dr. Bello, who again noted Murch's musculoskeletal tenderness and added inflammatory arthritis to his conditions. AR 2660-61. Furthermore, Murch submitted another report from Dr. Kenneally, where she concluded that Murch's "symptom complex, which includes excessive daytime sleepiness, precludes him from maintaining functionality throughout the course of a work day in his own profession." AR 2668.

Shortly thereafter, Dr. Scalise and Dr. Cosmo provided additional addendum reports, where Dr. Scalise remarked that Dr. Bello's determination regarding new inflammatory arthritis lacked "objective findings." AR 2685. Dr. Cosmo again remarked on the lack of objective evidence supporting any limitations. AR 2692.

Around this time, Sun Life submitted a request to Dr. Sugarman, providing him with the previously withheld documents. However, Sun Life ultimately cancelled the request for an addendum report, concluding that based on Murch's May 1 representation, he had agreed that he lacked a disabling psychiatric or cognitive impairment. On May 22, 2020, Murch submitted another letter. Upon receiving more records from Murch, Sun Life requested addendum reports from Dr. Scalise and Dr. Cosmo. Again, their opinions did not change.

On June 15, 2020, Sun Life informed Murch that it was upholding its denial of disability benefits. In its letter, Sun Life reiterated the history of the appeals process and excerpted portions of its reviewing consultant's reports. Sun Life wrote:

> [W]e did not deny Mr. Murch's claim because his treatment providers have not yet established the etiology of his multiple symptoms or confirmed diagnoses rather that the consultants' reviews of medical data did not support

11

restrictions/limitations. Alternatively, a formal diagnosis such as obstructive sleep
apnea and fibromyalgia do not necessarily constitute a Total Disability.

AR 2778. Although Sun Life recognized the "potential for accumulative effects," "[a]bsent of any
identified functional impairments across several specialties, there are no accumulative impairments
to impact each other or combine." AR 2784.

Because his employee benefit plan was governed by ERISA, Murch challenged this decision
in Court. The case was previously before Judge Feinerman, who found that the terms of the Policy
required a Court to undertake arbitrary and capricious review of challenges to Policy determinations.
This case was then transferred before this Court, which now considers the parties' cross-motions for
summary judgment.

**LEGAL STANDARD**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as
to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.
56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).
A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury would
return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.
Ct. 2505, 2510, 91 L. Ed. 2d. 202 (1986). When determining whether a genuine dispute as to any
material fact exists, the Court must view the evidence and draw all reasonable inferences in favor of
the nonmoving party. *Id.* at 255; *Lovelace v. Gibson*, 21 F.4th 481, 483 (7th Cir. 2021).

**DISCUSSION**

Pursuant to ERISA, "[a] civil action may be brought . . . to recover benefits due to [a
participant] under the terms of his plan, to enforce his rights under the terms of the plan, or to
clarify his rights to future benefits." 29 U.S.C. § 1132(a)(1)(B). Murch has properly sought relief
under this statute. The extensive factual record here, which the Court has closely reviewed, clearly
demonstrates that Murch faces several health issues—and the Court recognizes that his ailments

have had great impact on his livelihood and wellbeing. But it is not the Court's role to decide if Murch is deserving of disability benefits. Rather, the Court's role is restricted to determining whether Sun Life's decision to deny his disability insurance benefits was arbitrary and capricious.

"[A]rbitrary-and-capricious review turns on whether the plan administrator communicated specific reasons for its determination to the claimant, whether the plan administrator afforded the claimant an opportunity for full and fair review, and whether there is an absence of reasoning to support the plan administrator's determination." *Majeski v. Metro. Life Ins. Co.*, 590 F.3d 478, 484 (7th Cir. 2009) (internal citation omitted). Courts will uphold plan decisions when "(1) it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, (2) the decision is based on a reasonable explanation of relevant plan documents, or (3) the administrator has based its decision on a consideration of the relevant factors that encompass the important aspects of the problem." *Cerentano v. UMWA Health & Ret. Funds*, 735 F.3d 976, 981 (7th Cir. 2013). Nonetheless, the Court will not simply "rubber-stamp" the decision. *Majeski*, 590 F.3d at 483. The reasons supporting denial of a claim must be communicated to the claimant and address reliable evidence provided by the claimant. *See Love v. Nat'l City Corp. Welfare Benefits Plan*, 574 F.3d 392, 398 (7th Cir. 2009). If a plan determinator "ignores, without explanation, substantial evidence that the claimant has submitted that addresses what the plan itself has defined as the ultimate issue," the plan's procedures were unreasonable. *Majeski*, 590 F.3d at 484.

I.     *Preliminary Matters*

Before delving into the parties' main arguments, the Court disposes of some preliminary matters. First, Sun Life advances in its briefing that the Court should uphold its denial because its decision was supported by substantial evidence. The case Sun Life cites in support of its proposed substantial evidence standard involves social security benefits. *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 21 L. E. 2d 842 (1971). The Court acknowledges that social security cases are

13

similar to ERISA cases, but they are not one in the same. *See, e.g., Love*, 574 F.3d at 398 (discussing how SSA determinations are different from plan determinations). Sun Life has not cited any precedent for this "substantial evidence" standard in ERISA cases. Therefore, the Court reviews Sun Life's decision pursuant to the arbitrary and capricious standard described above.

Next, Sun Life raises several matters in its briefing that go beyond the administrative record in this case. The Court finds it appropriate to limit its review to the materials Sun Life itself reviewed when making its decision. *See Krolnik v. Prudential Ins. Co. of America*, 570 F.3d 841, 843 (7th Cir. 2009) (discussing how courts should limit review to the administrative record when review is deferential). The Court will not consider extraneous materials beyond the administrative record provided to the Court.

## II. *Was Sun Life's Decision Arbitrary and Capricious?*

Based on the parties' briefing, the Court has identified five principal arguments regarding whether Sun Life's decision was arbitrary and capricious.[3] The Court addresses each in turn.

### A. Whether Sun Life Denied Murch's Claim Because He Failed to Identify the Precise Diagnosis of his Symptoms

Murch argues that Sun Life improperly denied his claim based upon a failure to identify the source of his symptoms, and he equates this dismissal to the doctors' failure to identify cognitive or neurological impairments. Murch documents a range of symptoms but acknowledges that doctors have had difficulty determining a precise diagnosis (or precise diagnoses) for these symptoms. Indeed, Sun Life's medical or claim reviewers (such as Dr. Jimmeh) remarked that they could not identify a precise diagnosis for Murch's symptoms. Regardless, Murch here has incorrectly conflated

---

[3] The Court notes that Murch's initial brief outlines seven reasons why Sun Life's decision was arbitrary and capricious that do not line up precisely with the Court's identified reasons. However, Murch's briefing often muddled these distinct points, where the Court found it difficult to assess which facts supported which argument. And after the initial briefing, the parties forewent addressing the specific contentions altogether and simply argued whether the decision was arbitrary and capricious. For the ease of analysis and structure, the Court focuses on five arguments addressed.

impairment with etiology. No evidence has been presented that Sun Life denied Murch's claim simply because Murch failed to identify a diagnosis. Sun Life made clear throughout its review and specifically in its denial letter that it did not deny Murch's claim because he did not identify a diagnosis for his symptoms, but rather because doctors did not identify any precise impairments that limited his ability to work. The Court finds that the undisputed material facts do not support Murch's contention that Sun Life denied his claim because he failed to identify a diagnosis.

B. <u>Whether Sun Life Disregarded the Policy's Own Occupation Standard</u>

Murch claims that Sun Life's decision was arbitrary and capricious because Sun Life did not appropriately consider its Policy's "Own Occupation" standard when assessing his claim. Under the Policy, a person is totally disabled when they are unable to perform one or more of the material and substantial duties of their Own Occupation (as defined by the Policy). Murch claims this required Sun Life to consider his ability to perform all aspects of his occupation, including the mental elements. *See Lacko v. United of Omaha Life Ins., Co.*, 926 F.3d 432, 446 (7th Cir. 2019) (discussing how it was "questionable" for the insurer to adopt a job description that did not encompass the "essential duties" of the claimant's occupation). According to Murch, Sun Life failed to appropriately evaluate its Own Occupation standard because it did not provide its file reviewers with Murch's fulsome job description—that of a shareholder at a multinational law firm. Sun Life responds that it not only *did* consider Murch's occupation when denying the claim—which an occupational consultant deemed to be a "lawyer-business law"—but that it was appropriate for Sun Life (and not the doctors) to consider his occupation. In Sun Life's view, the doctors were only asked to opine on Murch's limitations; if they had identified limitations, *then* Sun Life would have assessed whether those limitations impacted Murch's ability to work as an attorney.

Contrary to Murch's assertions, the facts presented show that Sun Life did give some consideration to Murch's Own Occupation, as defined by the Policy, which included evaluation of

his job's non-physical demands. Sun Life's multi-step approach appears reasonable under the Policy. It is not up to this Court to determine whether this was the best approach to take when soliciting file reviews from doctors. Instead, given the deference courts provide to plan administrators, the Court finds Sun Life's actions in applying its own Occupation Standard were not arbitrary and capricious.

C. Whether Sun Life Failed to Undertake a Holistic Review of Murch's Claims File

Murch further contends that Sun Life's decision was arbitrary and capricious because it did not address the combined, holistic impact of his symptoms. *See Maiden v. Aetna Life Insurance Co.*, No. 3:14-cv-901, 2016 WL 81489, at *7 (N.D. Ind. Jan. 6, 2016) (finding that the insurer "should have reviewed the compound effect of [claimant]'s physical impairments and his psychiatric issues, and its failure to do so was an arbitrary and capricious exercise of [the insurer]'s discretion"). Murch argues that no file reviewer actually considered all the effects of his co-morbidities, as they were limited to their areas of expertise. Indeed, the record shows reviewers commenting on their limited role: for example, Dr. Parikh focused on Murch's fibromyalgia symptoms, but deferred his opinion on some of Murch's remaining symptoms, like fatigue, to other reviewers with more expertise.

Nevertheless, it appears Sun Life *did* undertake a holistic evaluation. For instance, it requested an occupational assessment from Dr. Scalise where the doctor considered several of Murch's conditions. Murch does not dispute this but instead claims Dr. Scalise did not address the pertinent question: whether Murch could perform his own job duties. Murch contends that Dr. Scalise was improperly asked only to consider Murch's ability to conduct a sedentary job, where Dr. Scalise found that the medical conclusions did not preclude "function in an occupational capacity, 8 hours per day, 40 hours per week." AR 2510. As this Court has found, Sun Life's decision not to ask Dr. Scalise for his opinion on whether Murch was specifically able to perform his job as an attorney was not arbitrary and capricious. Thus, from this review, as well as the extensive additional

16

file reviews Sun Life solicited, it appears Sun Life did conduct a holistic examination of Murch's file. Thus, Sun Life's approach was not arbitrary and capricious in this respect.

D. Whether Sun Life Ignored Evidence of Murch's Disabilities

Throughout his briefing, Murch contends that it was wrong for Sun Life to disregard the evidence he provided in support of his disability. Indeed, "[t]o constitute a full and fair review under 29 U.S.C. § 1133(2), all the evidence that [claimant] submitted should have been considered by [the insurer]." *Semien v. Life Ins. Co. of North America*, 436 F.3d 805, 812 (7th Cir. 2006). Murch asserts that Sun Life did not account for the evidence his treating doctors provided. Sun Life argues that its review was thorough and that it properly based its conclusions on recommendations from its file reviewers.

As the Supreme Court has made clear:

> Plan administrators . . . may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician. But, we hold, courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation.

*Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834, 123 S. Ct. 1965, 155 L. Ed. 2d 1034 (2003); *Love v. Nat'l City Corp. Welfare Benefits Plan*, 574 F.3d 392, 397–98 (7th Cir. 2009) ("While plan administrators do not owe any special deference to the opinions of treating physicians, they may not simply ignore their medical conclusions or dismiss those conclusions without explanation.").

Sun Life provided the file reviewers with copious medical records upon which they based their decisions. The record here is not clear-cut and contains conflicting information. *See Davis v. Unum Life Ins. Co. of America*, 444 F.3d 569, 578 (7th Cir. 2006) ("[R]eaching a decision amid such conflicting medical evidence is a question of judgment that should be left to [the insurer] under the arbitrary-and-capricious standard."). The file reviewers reviewed these underlying reports, and often mentioned the findings of the treating physicians and SSA when coming to their conclusions. Thus,

the Court does not find, on the whole, that it was unreasonable for Sun Life to give greater weight to its file reviewer's reports than the opinions of Murch's treating physicians, given the underlying conflicting information.

Murch maintains that there are at least four specific examples where Sun Life improperly assessed the evidence: (1) Sun Life's dismissal of the SSA findings; (2) Sun Life's decision to afford Dr. Parikh's evaluation more weight than Murch's other treating physicians; (3) Sun Life's treatment of the surveillance footage; and (4) Sun Life's decision to forgo further evaluation of Murch's psychiatric and cognitive impairments. The Court discusses each in turn.

First, the Court does not find that Sun Life arbitrarily and capriciously dismissed the findings from the SSA. This Circuit has recognized that "[a]n administrator is not forever bound by a Social Security determination of disability, but an administrator's failure to consider the determination in making its own benefit decisions suggests arbitrary decisionmaking." *Holmstrom v. Metropolitan Life Ins. Co.*, 615 F.3d 758, 772–43 (7th Cir. 2010). Murch took a creative approach here. Conceding that the SSA denied his claim, he focuses on the SSA's finding that he lacked the ability to perform "skilled" work as evidence in support of his claim. However, Sun Life *did* consider the SSA's finding, among the other documents provided, and simply did not agree that they were dispositive. That does not amount to arbitrary conduct.

Second, Murch maintains that Sun Life's decision improperly gives more credence to Dr. Parkih's fibromyalgia findings over the findings of the SSA and others. There was conflicting evidence in the record regarding the severity of Murch's pain and his scores on tender points /trigger points analyses, but in its decision on Murch's appeal, Sun Life adopted Dr. Parkih's explanation as to why he came to his conclusion in spite of the contradictory reports. As explained above, it was reasonable for Sun Life to make this choice.

18

Third, Murch argues that the surveillance footage actually supports his claim, and Sun Life's failure to appropriately evaluate it was arbitrary and capricious. He points to the fact that he was viewed sleeping on a bench and that the footage did not show him leaving his house for several days during the first surveillance period. Sun Life and its reviewers, on the other hand, focused on surveillance showing Murch's ability to drive, shop, and support his children. Murch cites to *Druhot v. Reliance Standard Life Ins. Co.*, where a court conducting a trial on the papers under Federal Rule of Civil Procedure 52 found that surveillance regarding inconsequential activities had no bearing on the claimant's ability to be an attorney. No. 16-cv-2053, 2017 WL 4310653, at *9 (N.D. Ill. Sept. 28, 2017) (Gottschall, J.). But the parties did not bring Rule 52 motions in this case, and instead brought motions for summary judgment. Based on the undisputed material facts, the Court holds that none of the file reviewers' findings, nor Sun Life's viewpoints, on the surveillance are unreasonable, and the Court does not find that this argument supports Murch's claim.

Murch's fourth contention, that Sun Life improperly disregarded evidence of his psychiatric and cognitive disabilities, has more weight to it. In its briefing, Sun Life explained that it declined to further consider Murch's psychiatric and cognitive impairments after his attorney allegedly conceded that Murch did not face disabilities on these bases. Sun Life points to Murch's May 20, 2020 letter, where his attorneys wrote "As your consultants have reported, Mr. Murch is not suffering from a disabling psychiatric or cognitive impairment." AR 2592. Sun Life contends that, at this point forward, it did not further investigate claims involving these impairments. AR 2779.

The Court finds that Sun Life's decision to stop considering evidence of cognitive and psychiatric impairments based on this letter to be arbitrary and capricious. As Murch made clear from the onset of his claim, he faced many combined symptoms, including psychiatric or cognitive impairments, which he believed made him unable to work. The Court finds it doubtful that Murch would have suddenly had this about-face regarding his claimed disabilities, and the record does not

suggest that Murch disavowed claims based on cognitive and psychological impairments. Instead, the record indicates symptoms related to these claims, including repeated references to somatic symptom disorder, which could impact how Murch evaluates his own symptoms. Furthermore, because Sun Life stopped analyzing psychiatric and cognitive claims, they did not give their psychiatric file reviewer Dr. Sugarman Murch's full record. As a result, the Court finds that Murch's file did not receive a full and fair review on this point.

The Court also finds it unreasonable for Sun Life to not inform Murch that it would no longer investigate certain portions of his claim. If Sun Life had informed Murch sooner, he could have corrected the misinterpretation to ensure his file received a full review. *See, e.g., Zall v. Standard Ins. Co.*, 58 F.4th 284, 297 (7th Cir. 2023) (finding a delay in providing a report meant plaintiff did not have a full and fair opportunity to review its contents).

Furthermore, the Court finds that the Sun Life's conflict of interest also justifies a finding that Sun Life's disregard of Murch's psychiatric and cognitive complaints was arbitrary and capricious. *See Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 117, 128 S. Ct. 2343, 171 L. E. 2d 299 (2008) (discussing how the conflict of interest in ERISA cases can be considered a tiebreaker when the "circumstances suggest a higher likelihood that it affected the benefits decision"). In ERISA cases, courts review the structural conflict of interest that arises from the insurer's role as an administrator and determinator of benefits. *See Raybourne v. Cigna Life Ins. Co. of New York*, 700 F.3d 1076, 1081–82 (7th Cir. 2012). Courts consider "the reasonableness of the procedures by which the plan administrator decided the claim, any safeguards the plan administrator has erected to minimize the conflict of interest, and the terms of employment of the plan administrator's staff that decides benefit claims" when assessing a claim. *Majeski*, 590 F.3d at 482.

Sun Life asserts it minimized its conflict of interest by engaging independent file reviewers (although it must be noted that Murch contests whether these reviewers were indeed independent).

Nonetheless, Sun Life's interpretation of the evidence, particularly Murch's attorneys' letter, is a selective reading of the evidence (particularly Murch's attorney's letter). Thus, the undisputed facts suggest that the structural conflict influenced Sun Life's decision. *See Lacko*, 926 F.3d at 440 (discussing how a conflict of interest may be present when the determinator "engages in only a selective presentation of the evidence in the record, focusing on the portions that will support a denial of the claim and ignoring or misrepresenting the facts that could demonstrate the disability").

In sum, the Court holds that Sun Life's decision to stop investigating Murch's psychiatric and cognitive complaints was arbitrary and capricious. *See Majseki*, 590 F.3d at 484 ("By ignoring [] key medical evidence, [the insurer] can hardly be said to have afforded [the claimant] an opportunity for full and fair review, and its failure to address that evidence in its determination surely constitutes an absence of reasoning.").

E. Whether Sun Life's Reviewers Impermissibly Demanded Objective Evidence

Murch's remaining key contention is that Sun Life acted in an arbitrary and capricious manner when it demanded that Murch provide objective evidence of his functional limitations. Courts have expressed concern that plan administrators may improperly discount subjective complaints, like pain and fatigue, simply because these claims are self-reported. For example, in *Kennedy v. Lilly Extended Disability Plan*, the Circuit concluded it was improper for doctors to request laboratory data and other objective measures for fibromyalgia when the symptoms would not appear on those tests. 856 F.3d 1136, 1139 (7th Cir. 2017). It is also well-settled that "although a plan may not deny benefits solely on the basis that the symptoms of the claimed disability are subjective, a plan may deny benefits because a claimant has failed properly to document pain-induced functional limitations." *Majeski*, 590 F.3d at 485 (internal citations omitted); *see also Williams v. Aetna Life Ins. Co.*, 509 F.3d 317, 322 (7th Cir. 2007) ("A distinction exists however, between the amount of fatigue

or pain an individual experiences . . . and how much an individual's degree of pain or fatigue limits his function capabilities, which can be objectively measured.").

Sun Life now claims that it simply asked for objective evidence of limitations, and that the doctors properly found there were not any. Murch contends that the file review doctors discounted the evidence he provided, such as sleep scores and doctors' recitation of his limitations, which Murch asserts were objectively measurable. Sun Life responded that because Murch had a known tendency to exaggerate his claims, this evidence could be discredited.

Insurers "must consider the possibility that applicants are exaggerating in an effort to win benefits (or are sincere hypochondriacs not at serious medical risk)." *Mote v. Aetna Life Ins. Co.*, 502 F.3d 601, 607 (7th Cir. 2007) (quoting *Leipzig v. AIG Life Ins. Co.*, 362 F.3d 406, 409 (7th Cir. 2004)). This Court finds troublesome that Sun Life, and its reviewers, did not seem to appropriately consider Murch's potential psychiatric conditions, like Somatic Symptom Disorder, and how these conditions could impact his credibility. This is amplified by its failure to provide the full medical record to the psychiatric reviewer. The Court does not mean to insinuate that Murch indeed has somatic symptom disorder, nor does it make any finding that this disability would prevent him from working in his Own Occupation. But Sun Life's analysis improperly discounted this disorder and the effect it could have on Murch's symptomology and his ability to work. As a result, the Court finds that Sun Life's treatment of Murch's psychiatric conditions, assessment of his reliability, and consequently its review of his objective evidence, to be arbitrary and capricious. Because of these fatal flaws, particularly the decision Sun Life made near the end of its review to stop certain portions of its investigation, the Court will not uphold Sun Life's disability determination.

### III. Next Steps

Because this Court finds that Sun Life's decision was arbitrary and capricious, the Court grants Murch's summary judgment motion and denies Sun Life's motion. Sun Life contended that if

the Court reached this conclusion, the Court should remand the case back to Sun Life for further proceedings. Murch claims that the proper remedy is to reward him full benefits. The Court agrees with Sun Life. Murch has not shown, based on the evidence provided, that he is entitled to benefits. *See Majseki*, 590 F.3d at 484 (discussing how it is a "rare case where the record before us contains such powerfully persuasive evidence that the only determination the plan administrator could reasonably make is that the claimant is disabled"). As a result, the Court finds it proper to return the case to the status quo and remand the case back to Sun Life to conduct further review in accordance with this decision. *See Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771, 776 (7th Cir. 2003) ("In a case where the plan administrator did not afford adequate procedures in its initial denial of benefits, the appropriate remedy respecting the *status quo* and correcting for the defective procedures is to provide the claimant with the procedures that []he sought in the first place.").

IV.    *Plaintiff's Entitlement to Waiver of Premium Benefit for Life Insurance*

The parties also dispute whether plaintiff is entitled to reinstatement of his group life insurance coverage. An email from Greenberg Traurig, LLP explains that Murch had $1,000,050.00 of firm-paid life insurance. AR 119. Murch contends that because he had this life insurance, and is totally disabled, he qualifies for a waiver of premium benefit. Sun Life contends that, regardless of his disability status, Murch's firm-paid life insurance does not fall within the waiver of premium provision because he only has basic life insurance and the waiver of premium provision only applies to optional life insurance. *See* AR 50–51. The Policy indeed distinguishes between basic life insurance and optional life insurance, and the waiver of premium provision only mentions optional life insurance. *Id.* However, it is unclear from the facts presented whether Murch's insurance was optional life insurance or basic life insurance. Although Sun Life emphasizes that employees do not contribute to basic life insurance and do contribute to optional life insurance, the Policy says nothing as to whether the *employer* also does not contribute to optional life insurance. AR 36.

23

Simply put, there is an unresolved question about what constitutes "firm-paid" life insurance. Because of this dispute of material fact, the Court will not grant summary judgment to either party on this issue.

**CONCLUSION**

For the aforementioned reasons, Murch's motion for summary judgment is granted in part and denied in part, and Sun Life's motion is denied in its entirety. This case is remanded or returned back to Sun Life for reconsideration in accordance with this opinion.

**IT IS SO ORDERED.**

Date: 4/24/2023

Entered: _____
SHARON JOHNSON COLEMAN
United States District Judge